Case: 1:24-mj-00351
Assigned to: Judge Upadhyaya, Moxila A.
Assign Date: 11/1/2024
Description: COMPLAINT W/ ARREST WARRANT

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Alan R. Poorman, being duly sworn, depose and state as follows:

### I.    INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

1.    I make this affidavit in support of a criminal complaint charging **Taskin TORLAK** ("**TORLAK**") with knowingly and willfully conspiring to violate, and causing a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act ("IEEPA"). Specifically, from at least in or around November 2020 until in or around June 2023, **TORLAK** and others known and unknown conspired 1) to cause U.S. persons, including U.S. financial institutions, to engage in transactions to facilitate the transportation and sale of Venezuelan petrochemical products for the benefit of Petroleos de Venezuela, SA ("PdVSA") – the Venezuelan state-owned oil and gas company – without the required approval of the U.S. government; and 2) to evade the sanctions imposed on PdVSA by the U.S. government.

2.    The facts set forth in this affidavit are based on information that I have obtained from my personal involvement, and from other law enforcement officers who have been involved, in this investigation, documents that I have reviewed, and my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

3.    This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

### II.    AGENT BACKGROUND

4.    I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and I have served in this capacity since April 2006. I am currently assigned to the HSI, Washington, D.C., Counterproliferation Investigations group.

My duties require me to enforce various federal laws, to include conducting investigations that relate to crimes involving export control and sanctions violations. As a Special Agent of HSI, I have gained experience over the last 18 years in identifying and investigating such violations, and I have also received training in investigating such violations through the Federal Law Enforcement Training Center.

5.      Based upon my training and experience, I am familiar with the methods employed by subjects in national security investigations to circumvent U.S. sanctions by obfuscating their involvement in transactions.

6.      I am one of the case agents involved in this investigation. The information obtained over the course of the investigation has revealed that **TORLAK**, together with known and unknown coconspirators, has conspired to violate IEEPA. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

### III.      STATUTORY VIOLATIONS

### The International Emergency Economic Powers Act

7.      The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1709, grants the President the authority to deal with an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States. Pursuant to 50 U.S.C. § 1705, it is a crime for a person to willfully commit, attempt to commit, conspire to commit, or cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

8.      The Department of the Treasury's Office of Foreign Assets Control ("OFAC") enforces and administers economic sanctions to accomplish U.S. national security and foreign

policy goals. In particular, OFAC maintains a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. When an individual or entity is designated pursuant to an Executive Order and placed on the SDN List, their property and interests in property, subject to U.S. jurisdiction or in the possession or control of U.S. persons, are blocked. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

9.      Since 2014, the United States has imposed incremental sanctions on targeted individuals, entities, and sectors in Venezuela to address the increasing political oppression and corruption in Venezuela that began shortly after Nicolás Maduro assumed office in March 2013.

10.     On March 8, 2015, the President signed Executive Order (E.O.) 13692, which found that the situation in Venezuela, including certain actions and policies of the Government of Venezuela under then-President Maduro, constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency under IEEPA to deal with that threat. In multiple subsequent Executive Orders in 2017, 2018, and 2019, the President continued and took additional steps with respect to the national emergency declared in E.O. 13692, which remains in effect through the present.

11.     Among those Executive Orders, on November 1, 2018, the President signed E.O. 13850 ("Blocking Property of Additional Person Contributing to the Situation in Venezuela"). E.O. 13850 authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to impose blocking sanctions on individuals and entities operating in any sector of the Venezuelan economy as determined by the Secretary of the Treasury, in consultation with the Secretary of State.

3

12.     E.O. 13850 prohibits, among other things: (1) making any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to E.O. 13850; (2) the receipt of any contribution or provision of funds, goods, or services from any such person; (3) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in E.O. 13850; and (4) any conspiracy formed to violate any of the prohibitions set forth in E.O. 13850.

13.     On January 28, 2019, pursuant to E.O. 13850, the Secretary of the Treasury, in consultation with the Secretary of State, determined that blocking sanctions should apply to the oil sector of the Venezuelan economy. On the same day, pursuant to this determination, OFAC designated PdVSA, which together with its subsidiaries controls the exploration, exploitation, production, and refining of crude oil and other hydrocarbons in Venezuela and its exportation from Venezuela.[1]

14.     In a further action, on August 5, 2019, the President signed E.O. 13884 ("Blocking Property of the Government of Venezuela"). E.O. 13884 blocked the property and interests in property of the Government of Venezuela and any political subdivision, agency or instrumentality thereof, including PdVSA.

15.     To implement E.O. 13692 and the subsequent Executive Orders, OFAC issued the Venezuela Sanctions Regulations. *See* 31 C.F.R. part 591. The Venezuela Sanctions Regulations

---

[1] Between October 18, 2023, and April 17, 2024, OFAC temporarily suspended certain sanctions with respect to Venezuela's oil and gas sector, including sanctions involving PdVSA. The Venezuela-related oil transactions described below predate this period of time.

incorporate by reference the prohibitions set forth in the E.O.s 13850 and 13844. 31 C.F.R. § 591.201.

16.     E.O. 13850, E.O. 13844, and Venezuela Sanctions Regulation generally prohibit, among other things:

a.   Transactions and dealings by U.S. persons, including U.S. financial institutions, or within the United States, in property and interests in property of PdVSA.

b.   The provision of funds, goods, and services by U.S. persons, including U.S. financial institutions, wherever located, to or for the benefit of PdVSA.

c.   Transactions and dealings by U.S. persons, including U.S. financial institutions, or within the United States, that evade or avoid, or have the effect of evading or avoiding, any of the prohibitions of E.O. 13850, E.O. 13884, and the Venezuela Sanctions Regulations.

d.   Conspiracies and attempts to violate any of the prohibitions of E.O. 13850, E.O. 13884, and the Venezuela Sanctions Regulations.

### IV.     VENUE

17.     Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia, namely the failure to obtain a license from OFAC, which is located in the District of Columbia, in furtherance of the offenses referenced herein. *See* 18 U.S.C. § 3237.

### V.     FACTS SUPPORTING PROBABLE CAUSE

18.     This complaint arises from a conspiracy by entities and individuals to utilize U.S. financial institutions to facilitate the shipment and sale of sanctioned Venezuelan and Iranian petrochemical products, including for the benefit of Petroleos de Venezuela, S.A., a Specially

Designated National, without the required license(s) from OFAC, beginning in or around November 2020 until in or around June 2023.

**A. Background on the Co-Conspirators and Relevant Entities**

19.     **TORLAK** is a Turkish national and the operator of several companies involved in the shipment of sanctioned oil.

20.     CO-CONSPIRATOR 1 is a Ukrainian national and the operator of numerous companies implicated in the smuggling of oil originating from sanctioned entities or comprehensively sanctions jurisdictions.

21.     CO-CONSPIRATOR 2 works for a China-based shipping company that owned the M/T Melissa Amy during the relevant time period.

22.     CO-CONSPIRATOR 3 is a tanker captain believed to be based in Turkey. CO-CONSPIRATOR 3 is also the general manager of a ship management company controlled by **TORLAK** that is incorporated in the Marshall Islands ("CO-CONSPIRATOR 4").

23.     CO-CONSPIRATOR 5 is another company operated by **TORLAK** that is used in the management of vessels.

24.     CO-CONSPIRATOR 6 is a company managed by CO-CONSPIRATOR 1 that is used in the sale and payment of illicit oil.

25.     PdVSA is the Venezuelan state-owned oil company. As discussed above, OFAC designated PdVSA in January 2019 pursuant to E.O. 13850 and in August 2019 pursuant to E.O. 13884. According to OFAC, PdVSA is a primary source of income and foreign currency, including the U.S. dollar and the Euro, for the Venezuelan government.

**B. The Beginnings of the Conspiracy to Transport Oil from Sanctioned Entities/Jurisdictions**

26.    In or around November 2020, **TORLAK** entered into a cooperation agreement with CO-CONSPIRATOR 1 in the names of their companies, CO-CONSPIRATOR 4 and CO-CONSPIRATOR 6. CO-CONSPIRATOR 4 was described as having "operational and technical expertise [as] the vessel's official technical managers."[2] CO-CONSPIRATOR 6 was described as having "commercial expertise in the vessel freight business and . . . the commercial relations with customers of related services."

27.    Under the cooperation agreement, CO-CONSPIRATOR 4 would pay CO-CONSPIRATOR 6 50% of any profit relating to shipments made by three specified vessels: M/T Mirame, the M/T Ligera, and the M/T Kitakaze.

**C. The Conspiracy to Transport Venezuelan Oil Onboard the M/T Mirame**

28.    One of the specified vessels in the cooperation agreement was the M/T Mirame (International Maritime ("IMO") No. 9227948), a vessel that, as described below, transported Venezuelan oil in a voyage facilitated by payments that transited the U.S. financial system, in violation of U.S. economic sanctions.

29.    On or about November 3, 2020, **TORLAK** wrote to CO-CONSPIRATOR 1 updating him on the status of two vessels. He stated: "3,850 tons of VLSFO [*i.e.*, very low sulphur fuel oil] for Mirame, delivery should be between 9/12 November at Singapore anchorage." Later that same day, **TORLAK** told CO-CONSPIRATOR 1: "Basis supply tomorrow, so no delays for the vessel."

30.    On or about January 3, 2021, **TORLAK** wrote to CO-CONSPIRATOR 1 in the same series of communications: "We really need those clean fleet under management as well

---

[2] All spelling and grammatical errors throughout in original.

7

(under a completely separate name). Two reasons, to of course make some money but more importantly to cover the fund transfers for V[enezuela] i.e. for Mirame spare parts, we could use one of the clean names to avoid money getting stuck somewhere, if we will run into issues with Mirame soon." From my training and experience, I believe that **TORLAK** was referring to establishing a fleet of "clean" vessels, *i.e.*, vessels that have not been publicly associated with the transportation and sale of oil from sanctioned entities or jurisdictions, to avoid U.S. financial institutions from blocking payments related to the maintenance of the network's vessels and to mitigate the likelihood of OFAC identifying the network's vessels as blocked property. Regarding the reference to the "money getting stuck somewhere," I know from my training and experience that OFAC can block wire payments or accounts (or financial institutions can do so on their own initiative) if there is reason to believe the funds are tied to sanctions evasion activities.

31.    On or about January 9, 2021, **TORLAK** updated CO-CONSPIRATOR 1 that the underwater diving inspection of the M/T Mirame had been completed.

32.    On or about the next day, January 10, 2021, **TORLAK** told CO-CONSPIRATOR 1 that the M/T Mirame had set sail. TORLAK responded: "good." **TORLAK** provided an estimated arrival for the M/T Mirame in Singapore of March 4, 2021.

33.    On or about January 18, 2021, **TORLAK** sent CO-CONSPIRATOR 1 an article titled "The loot of Venezuela continues."[3] That article stated that the M/T Marime and the M/T Kitakaze, two of the vessels that **TORLAK** and CO-CONSPIRATOR 1 were managing pursuant

---

[3] *See* https://infodio.com/170121/loot/venezuela/pdvsa/rosneft/mirame/kitakaze.

to their cooperation agreement, had arrived in Venezuela in late-December with their AIS systems[4] turned off and had loaded oil cargo from PdVSA. The article also stated that "U.S. Treasury designations may expose involved parties, i.e. [PdVSA's purported customer for the oil] and current owners of Mirame and Kitakaze, to OFAC sanctions."

34.    Regarding how the information about the voyages had become public, **TORLAK** wrote to CO-CONSPIRATOR 1: "Anything vessel sends to the terminal [the Jose Terminal in Venezuela, which is owned and/or operated by PdVSA] is passed onto those hands. I told [another member of the network] that we must stop sending any document to the terminal with actual vessel's names. Also I suggested our ops guy must go to V[enezuela] during next loading to understand how our information passed through the parties. I want to pass all the info in hard copy to the terminal/shippers as oppose[d] to emails so to avoid info being passed around." He then suggested, "maybe PDVsA guys emails are even hacked so anything goes to that inbox is seen." CO-CONSPIRATOR 1 responded: "This I'm almost sure about."

35.    **TORLAK** and his co-conspirators caused U.S. financial institutions to process U.S. dollar transactions to facilitate the M/T Mirame's loading and shipment of Venezuelan oil for the benefit of PdVSA, in violation of the U.S. sanctions imposed on PdVSA:

    a.    On or about November 2, 2020, a company associated with TORLAK wired $30,791 through U.S. Financial Institution 1 to an Indonesia shipping, logistics, and marine services company. The wire reference stated "MIRAME."

    b.    On or about November 4, 2020, a company affiliated with **TORLAK** wired $4,051

---

[4] AIS or "Automatic Identification System" is a standard maritime system that is utilized by all vessels to broadcast vessel type, position, speed, direction, etc. for navigational purposes, much like commercial airlines utilize transponder data.

through U.S. Financial Institution 2 to the same Indonesia company. Again, the wire reference stated "MIRAME."

c. On or about November 5, 2020, a company associated with TORLAK wired $1,700 through U.S. Financial Institution 1 to a beneficiary called "FLAG DELETION," which based on my training and experience I understand to mean removing the flag under which a vessel previously sailed. The wire reference was "TENACITY SYMPHONY DELETION." The M/T Trident Symphony was the prior name of the M/T Mirame. The M/T Trident Tenacity was the prior name of M/T Kitakaze.

d. On or about November 9, 2020, a company associated with **TORLAK** wired $1,400 through U.S. Financial Institution 1 to the Marshall Islands to pay for the M/T Mirame's new flag.

36. The investigation has also developed evidence that PdVSA was using U.S. dollars to pay **TORLAK** and CO-CONSPIRATOR 1 to facilitate the shipment of its oil. The communications encompass at least part of the period of the M/T Mirame's voyage to Venezuela described above and the M/T Melissa Amy's voyage described below.

a. A letter dated June 29, 2023 on CO-CONSPIRATOR 5 letterhead to PdVSA stated: "We would like to emphasize our satisfaction in operating our fleet under the commercial interest serving the Bolivarian Republic of Venezuela and PdVSA Petroleo S.A. for nearly 2.5 years, with strong technical management and continuous validation from charterers." The letter went on to complain of lack payments by PdVSA and stated that: "Out of the outstanding amount of USD 57,797,325.88, we have received up to date only approximately 32,5 M$, as indicated in the Statement of Account dated 29.06.2023."

b. A letter dated the next day, June 30, 2023, also on CO-CONSPIRATOR 5 letterhead to PdVSA, stated: The attached statement of account and invoices clearly indicate that PdVSA Petroleo S.A. has an unpaid outstanding amount of approximately 25 million USD to the owners."

c. A letter dated July 3, 2023 on PdVSA letterhead directed to CO-CONSPIRATOR 5 in response to the above-described letters stated: "[CO-CONSPIRATOR 5] has acknowledged to have received US$ 32,878,939 in payments from PdVSA in its letter."

**D.  The Conspiracy to Transport Venezuelan Oil Onboard the M/T Melissa Amy**

37.     Beginning in or around at least February 2021, **TORLAK**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and CO-CONSPIRATOR 3 communicated via email about transporting Venezuelan oil for the benefit of PdVSA onboard the M/T Melissa Amy (IMO No. 9174397).

38.     On or about February 16, 2021, CO-CONSPIRATOR 2 sent CO-CONSPIRATOR 1 transaction documents for the shipment of petrochemical products onboard the M/T Melissa Amy, copying **TORLAK**, CO-CONSPIRATOR 3, and others. One of those documents was a charter party agreement, which is a contract between a tanker owner and a tanker charterer governing the terms and conditions of the charter of the relevant vessel for a specific voyage or time period.

39.     **TORLAK** responded on or about February 17, 2021 asking for some additional documents. He also noted that the M/T Melissa Amy appeared to have been recently renamed from the M/T Sino Macro. I know from my training and experience that tankers involved in the shipment of sanctioned oil are periodically renamed as part of an effort to avoid detection by law

enforcement and designation by OFAC as blocked property. Open-source information indicates that the M/T Melissa Amy has subsequently been renamed again to the M/T Lisa.

40.    On or about February 18, 2021, CO-CONSPIRATOR 3, whose email signature indicated that he was the "General Manager" of CO-CONSPIRATOR 4, responded in the same email chain seeking additional paperwork for the charter of the M/T Melissa Amy. CO-CONSPIRATOR 2 responded that "our tech manager Capt [name] will be along with the required documents." **TORLAK** responded that "Captain [CO-CONSPIRATOR 3] is in cc on our side who will deal with this case."

41.    Over the following several days, the parties continued to negotiate the terms of the charterparty agreement. On or about February 23, 2021, CO-CONSPIRATOR 3 wrote to CO-CONSPIRATOR 2, still copying **TORLAK** and CO-CONSPIRATOR 1:

> Charterer would like to insert following wordings on the [charterparty agreement] to highlight to operational issues[.] CHARTERER SHALL PAY USD $3,000,000.00 HIRE DEPOSIT UPON THIS CHARTERPARTY BEING SIGNED BY VESSELS REGISTERED OWNERS AFTER VESSEL OFFICIALLY REGISTERED UNDER NEW OWNER, ON THE CONDITION THAT THE OWNERS:
>
> 1) RE-FLAG THE VESSEL AND FLY DJIBOUTI FLAG
> 2) H&M AND P&I INSURANCES TO BE EITHER [RUSSIAN INSURER] OR ANY OTHER CHINESE UNDERWRITERS. STEPS (1) AND (2) CAN BE CARRIED OUT PRIOR TO VESSEL DEPARTING SOUTH AFRICA OR VESSEL PASSING THE CAPE OF GOOD HOPE. CHARTERERS WILL ASSIST OWNERS WHERE POSSIBLE WITH THESE STEPS.
>
> OWNER SHALL FURTHER NOTE:
>
> 1) OWNERS TO AGREE ON CHARTERERS INSTRUCTION THROUGHOUT THE DURATION OF THE VOYAGE INCLUDING BUT NOT LIMITED TO TURNING OFF SOME ELECTRONIC DEVICES, SUCH AS VESSELS AIS AND OR VESSELS LRIT.
> 2) OWNERS TO AGREE ON DECLARING DIFFERENT VESSEL NAME VIA CHARTERERS AGENT/PEOPLE ON THE GROUND AT THE LOAD PORT. OWNER/MASTER WILL NOT COMMUNICATE WITH AGENT AND/OR AUTHORITIES IN LOAD PORT. ALL WILL BE HANDLED BY CHARTERERS SHORE STAFF.

3) OWNERS TO ALSO AGREE ON COVERING VESSELS NAME ALL
AREA PRIOR ARRIVAL OF THE LOAD PORT, WITH MAGNET TYPE
BLANKET OR SALE CLOTH OR PAINT IT OVER.

4) OWNER WILL STRICTLY FOLLOW THE CHARTERERS INSTRUCTION
AT THE LOAD PORT DOCUMENTS. CHARTERERS WILL ARRANGE
ALL NECESSARY DOCUMENTS ACCORDINGLY AFTER SAILING
FROM THE LOAD PORT, SUCH AS B/L CHANGE, CHANGE OF
PRODUCT NAME ETC IN WEST AFRICA MALAYSIA RANGE BUT
QUANTITY OF CARGO ALWAYS REMAIN THE SAME.

Ref to item 1; charterer would agree on intended Hong Kong flag if authorities will
create a problem while switch off the AIS and LRIT after passing South Africa, pls
check and advice.

42.    The email cited above contained several terms that I know from my training and

experience are indicative of sanctions evasion:

a.  Smugglers of sanctioned oil often periodically re-flag a vessel. A ship's flag reflects

the country where that ship is registered. Many countries' ship registries impose

high standards to ensure that the vessels sailing under their flags are safe and are

not used for illegal practices, such as sanctions evasion. This causes the operators

of tankers used to smuggle sanctioned oil to flag their vessels in countries with

lower standards. Periodically re-flagging a vessel in another country also works

similarly to re-naming vessels to evade law enforcement and OFAC designations.

b.  The request to use a Russian or Chinese P&I insurer[5] suggests an attempt to avoid

contracting with a company that follows U.S., European Union, and/or UN

sanctions.

c.  Oil smugglers often instruct a vessel's crew to turn off its AIS and LRIT systems

to avoid law enforcement and OFAC being able to track the vessel while it loads

---

[5] A P&I or "Protection and Indemnity Club" is a mutual insurance association that offers insurance
coverage for the operators of vessels. A vessel typically cannot pull into port without being able
to demonstrate P&I coverage.

cargo from comprehensively sanctioned jurisdictions, such as Iran, or sanctioned entities, such as PdVSA.[6]

d.  Oil Smugglers often re-paint or use blankets to cover a vessel's name and/or any distinguishing features, again to frustrate law enforcement's and OFAC's ability to track those vessels loading cargo in comprehensively sanctioned jurisdictions or from sanctioned entities.

e.  The reference to a "B/L CHANGE" appears to mean changing the cargo's Bill of Lading to state that the product originated in West Africa or Malaysia, rather than its true origin in Venezuela. Oil smugglers often change or forge Bills of Lading and related paperwork to mislead port personnel, financial institutions processing payments related to shipments, and others into believing the cargo is unsanctioned product.

43.     On or about February 25, 2021, CO-CONSPIRATOR 2 replied with responses and questions to each of the points above. CO-CONSPIRATOR 1 responded the same day, still copying **TORLAK**: "we intending to make specific trade and trade required special arrangements. If vessel will be tracked at load port she will become news st[ory] and possibly can be included in OFAC list. We can't take a risk to compromise cargo, company and other transaction we doing. Looks like it will be your first loading from V[enezuela] and if you are not ready to follow closely charterers instructions I don't think we can go in deal."

---

[6] LRIT or "Long-Range Identification and Tracking" is a system meant to provide for the global identification and tracking of ships. Both AIS and LRIT are important systems for maintaining the safety of a vessel and its crew.

44.    CO-CONSPIRATOR 3 then provided a point-by-point response to each of CO-CONSPIRATOR 2's questions. Regarding the re-flagging point, CO-CONSPIRATOR 2 asked, "what's mean for re-flag?" and CO-CONSPIRATOR 3, still copying **TORLAK**, answered: "Flag authorities always track the vessel via LRIT and see where she goes. Due to nature of the business we have to select the flag like a Djibouti which keep close their eyes and do not ask any question while we switch off the AIS and LRIT."

45.    Regarding the P&I club point, CO-CONSPIRATOR 2 responded that they planned on seeking P&I coverage through a U.S. P&I Club "but if Charterer insist, we will buy P&I insur[a]nce as above request." CO-CONSPIRATOR 3, still copying **TORLAK**, responded: "All IG [International Group] clubs have gentlemen's agreement and they do track[] the vessels through AIS system and if the system is off then they will start asking questions and if no satisfactory answer is given, they will kick the vessel out of club without any questions and will circulate the reason why it has been done. Pls read the below circulars to understand easily." CO-CONSPIRATOR 3 then linked to two circulars published by the U.S P&I insurer about OFAC's sanctions on Venezuelan oil and monitoring vessels to ensure compliance with U.S., UN, and United Kingdom sanctions programs.

46.    Regarding turning off the M/T Melissa Amy's AIS and LRIT, CO-CONSPIRATOR 2 responded: "The subject vsl [vessel] only can turn off the AIS, but can'[t] turn off vsl's LRIT because of the nationality is HONGKONG, CHINA." CO-CONSPIRATOR 3, still copying **TORLAK**, replied: "That's why we highly recommend to change flag as explained above. Owner should switch off both and fully disconnect the power cord and antenna connection."

47.    Regarding covering the vessel's name, CO-CONSPIRATOR 2 wrote: "we agree with Charterer in principle basis on Charterer should provide the changed Vessel's name, IMO

no., and nationality for easy covering." CO-CONSPIRATOR 3, still copying **TORLAK**, replied: "Physical name, IMO nr etc. will not change. Owner just cover all name, IMO nr etc with sale cloth or paint."

48.    CO-CONSPIRATOR 2 agreed with the provision that the charterer would change the Bill of Lading to state that the cargo had come from West Africa or Malaysia, instead of Venezuela.

49.    On or about March 3, 2021, CO-CONSPIRATOR 2 responded to CO-CONSPIRATOR 3's email, expressing some confusion about the process for how to re-flag the vessel mid-voyage. CO-CONSPIRATOR 2 wrote: "1. If our vessel become Djibouti flag, we agree with your suggestion as above. 2. If we insist to maintain Hongkong flag, then we only can turn off the AIS [instead of] both AIS and LRIT. Let me share our experience for other ships of Hongkong flag at Iran with you, all of ships into Iran before only turn off the AIS, and turn on the AIS once sailing from Iran sea area and never turn off the LRIT since 2012, until now they never get any inquiry or problem from flag authorities (Hongkong)." CO-CONSPIRATOR 2 then expressed concern that the value of the M/T Melissa Amy would fall if re-flagged from Hong Kong to Djibouti but said that "if Charterer can ensure to do consecutive voyages and pay guarantee deposit for the subject vsl, we can consider about a long business cooperation with Charterer and change above all for Charterer[.]" CO-CONSPIRATOR 2 also asked the charterer to "accept laycan change to 15/May-25/May."[7]

50.    On or about March 3, 2021, CO-CONSPIRATOR 1, still copying **TORLAK**, responded: "Iran and Venezuela trade different. In Iran you normally turning off AIS for one week,

---

[7] Laycan refers to the time period when a vessel is permitted to arrive at a loading port.

can be 10days and everything is nearby[.] [I]n Venezuela, if you want to be safe not being seen

and not up in US OFAC list, you have to turn of[f] both AIS and LRIT at WAF [West Africa] area,

time vessel will be in shadow 40days +/1. Means we need flag will not raise any questions. Same

as P&I, we for a example using [Russian insurer] because they accepting loading in Venezuela."

51.    On or about March 5 2021, CO-CONSPIRATOR 2 wrote that they "can accept

your request as [below] including t[ur]n off both AIS and LRIT at WAF area and using [Russian

insurer] for the subject vsl, but we have to consider about our risk and vsl's future[.]" CO-

CONSPIRATOR 2 then requested again that the charterer commit to consecutive voyages on the

M/T Melissa Amy and to renegotiate the payment terms." CO-CONSPIRATOR 2 added, "[a]s we

know, the republic of Togo flag can use as well for VCLL for Venezuela trade, so excluding Togo

and Djibouti, can you advise which else flag that will not raise any questions when turn off the

L[RI]T." CO-CONSPIRATOR 1 replied, "[d]idn't introduce myself, sorry, [CO-CONSPIRATOR

1]. I'm representing charterers. We are not in a position to renegotiate payment terms."

52.    Still on or about March 5, 2021, CO-CONSPIRATOR 2 replied that the terms were

still being negotiated because of the additional provisions that CO-CONSPIRATOR 3 had

proposed on or about February 23, 2021. CO-CONSPIRATOR 1 responded: "We are ok with 3mln

[USD] deposit and balance up to 40% upon vessel sailed to load port. Balance BBB [before

breaking bulk]."[8] As reflected in CO-CONSPIRATOR 2's original February 23 email, the relevant

portion of which CO-CONSPIRATOR 3 pasted into the March 5 email discussed above, the "3mln

deposit" was to be paid in U.S. dollars, although TORLAK later requested an invoice in Euros.

---

[8] A shipment is paid for "BBB" or "before breaking bulk" if payment is made before the cargo is
unloaded from the vessel.

53.     Still on or about March 5, 2021, CO-CONSPIRATOR 2 wrote to the group: "We insist the payment terms asf; $3,000,000 [USD] upon clean fix and balance up to 40% upon vessel within 3 days once vessel sailing f[ro]m Zhoushan, China[.] 60% bbb." CO-CONSPIRATOR 2 then asked, "which else flag that will not raise any questions once turn off the AIS and L[RI]T." **TORLAK** responded: "Any government based flag will not raise questions but our experience with Djibouti has been decent so far. These is also Sierra Leone or Mongolia flag but we haven't flow these flags during our operations so not able to give concrete comment." CO-CONSPIRATOR 1 then responded, agreeing to CO-CONSPIRATOR 2's proposed payment terms and laycan between May 15 and May 21, 2021.

54.     On or about March 9, 2021, **TORLAK** responded to the email chain with additional comments, which he said had "been raised by the head charterers." One of those comments was to revise the payment term to "$3,000,000 [USD] shall be paid by Charterers within three days after signing of the CP [charterparty] by Charterers and Owners." **TORLAK** said that the change "is purely for banking purposes as they will be requesting supporting evidence etc which may take one day to process the payment. Just to be on the safe side, three banking days will give sufficient room for effecting the payment." TORLAK also added his own question about the flagging issue: "do you have experience with the Togo flag? Despite Togo is a black flag do you know if they will start giving you enquiries for switching off LRIT? From my personal experience for when we used Togo, they are careful about even AIS being turned off so pleased to hear Owners comments."

55.     On or about April 29, 2021, a German bunkering services company ("GERMAN COMPANY 1") sent $600,240 to a Singaporean wholesale distributor of petrochemical products ("SINGAPOREAN COMPANY 1") through U.S. Financial Institution 1. The wire reference included "IMO. NO. 9174397," *i.e.*, the IMO number of the M/T Melissa Amy.

18

56.     On or about June 21, 2021, GERMAN COMPANY 1 sent $1,022,572.31 to SINGAPOREAN COMPANY 1 though U.S. Financial Institution 1. Again, the wire reference included the IMO number of the M/T Melissa Amy.

57.     A confidential source ("CS"), known to have provided credible information to law enforcement on past occasions, reviewed satellite imagery and confirmed that the M/T Melissa Amy loaded cargo on or about July 7, 2021 from the Jose Terminal in Venezuela, which is owned and/or operated by PdVSA. From my training and experience, I know that virtually all Venezuelan petrochemical products originate with PdVSA.

58.     On or about September 24, 2021, GERMAN COMPANY 1 sent $3,000 to a Singaporean tanker owner-operator and marine fuel supplier through U.S. Financial Institution 3. Again, the wire reference included the IMO number of the M/T Melissa Amy.

### E.  The Conspiracy to Transport Venezuelan Oil Onboard the M/T Gracy

59.     **TORLAK**, CO-CONSPIRATOR 1, and their co-conspirators knew that they could not lawfully use U.S. financial institutions to process transactions connected to the shipment of illicit Venezuelan oil, including oil from PdVSA in Venezuela. Despite this knowledge, **TORLAK** and his coconspirators entered into contracts with and for the benefit of sanctioned entities in U.S. dollars and utilized the U.S. financial system in furtherance of their dealings for the benefit of those sanctioned entities.

60.     The investigation has developed evidence that the co-conspirators have used, or have caused the use, of the U.S. financial system in furtherance of tankers chartered by TORLAK and CO-CONSPIRATOR 1 to ship Venezuelan oil.

61.     In or around middle to late 2021, **TORLAK**, CO-CONSPIRATOR 1, and other co-conspirators chartered the Vietnamese-owned M/T Gracy (IMO No. 9326720) to transport oil from

PdVSA in Venezuela. Open-source information confirms that the M/T Gracy was owned by a Vietnamese shipowner and was involved in the shipment of Iranian and Venezuelan oil.[9] Invoices reflect that CO-CONSPIRATOR 1 chartered the M/T Gracy around the relevant time period.

62.     On or about October 11, 2021, an employee of a company affiliated with **TORLAK** wrote that the M/T Gracy had completed loading her cargo on October 9, 2021 and was "waiting for documents at Amuay Bay [in Venezuela]."

63.     In a chat message from on or around December 6, 2021, **TORLAK** explained certain costs incurred by the M/T Gracy's voyage: "We are always facing sanction troubles, it's not easy to arrange supplies with good prices for sanction vessels."

64.     Other payments connected to the M/T Gracy's voyage to ship Venezuelan oil for the benefit of PdVSA in late-2021 were also made in U.S. dollars:

a.    On or about September 1, 2021, a Vietnamese insurance broker ("VIETNAMESE COMPANY 1") sent $97,725 to the Russian insurer discussed in the email chain about the M/T Melissa Amy. The payment was made through U.S. Financial Institution 4 and referenced "GRACY IMO 9326720" and another tanker.

b.    VIETNAMESE COMPANY 1 sent the Russian insurer a $97,725 payment through U.S. Financial Institution 4 on or about November 26, 2011. Again, the wire reference identified the M/T Gracy and another tanker.

c.    On or about January 19, 2022, VIETNAMESE COMPANY 1 made a $51,904.69 payment the Russian insurer through U.S. Financial Institution 4. The wire reference stated the transfer for was "REINSURANCE PREMIUM" for "ADD NO

---

[9]    *See*    https://www.unitedagainstnucleariran.com/blog/maduro-khamenei-oil-alliance-list-of-foreign-flagged-vessels-shipping-iranian-and-venezuelan.

1 AND 2 GRACY IMO 9326720."

65.     OFAC has confirmed that neither **TORLAK** nor any of his co-conspirators applied for and/or received a license for any of the transactions described above.

## VI.   CONCLUSION

66.     Based on facts described above, there is probable cause to believe that **Taskin TORLAK** and co-conspirators known and unknown have conspired to violate 50 U.S.C. § 1701 *et seq.*

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

67.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant. I submit that Assistant U.S. Attorney Maeghan Mikorski, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

Respectfully submitted,

Alan R. Poorman
Special Agent
Homeland Security Investigations

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on November 1, 2024

_____

UNITED STATES MAGISTRATE JUDGE

21